**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____X

RASHIDA WINFREY,

                Plaintiff,

- against -

JPMORGAN CHASE BANK, NA,

                Defendant.
_____X

Case No.:

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff, Rashida Winfrey, by and through her attorneys, Filippatos PLLC, hereby complains of Defendant JPMorgan Chase Bank, NA ("JPMC" or the "Company") upon personal knowledge, as well as information and belief, by alleging and averring as follows:

### NATURE OF THE CASE

      1.     In the wake of the murders of George Floyd and Breonna Taylor, corporate America rushed to declare its commitment to racial equity, vowing to address systemic injustices that had long plagued Black communities. JP Morgan Chase & Co. positioned itself at the forefront of this movement, publicly pledging $30 billion to advance racial equity through increased lending, investments, and financial support for minority entrepreneurs.

      2.     But behind the carefully crafted press releases and corporate platitudes, the reality at JPMC was far different. The Company woefully failed to fulfill its commitments and, instead, created a hostile and discriminatory work environment for the very people it claimed to empower.

      3.     When Plaintiff Rashida Winfrey, a highly credentialed Black woman with nearly two decades of financial industry experience, took on a leadership role to help implement JPMC's

racial equity initiatives, she quickly realized the program was built on deception. JPMC was not increasing access to capital for minority entrepreneurs—it was suppressing it. When Ms. Winfrey pushed for true commitment and accountability, she was met with hostility, resistance, and retaliation.

4.      Beyond the Company's failure to uphold its public commitments to racial equity, JPMC fostered a workplace riddled with gender discrimination, sexual harassment, and racial bias. Male colleagues belittled Ms. Winfrey, undercut her authority, and subjected her to misogynistic abuse. Senior Business Consultant, Samuel "Shea" Taylor, repeatedly demeaned and undermined Ms. Winfrey, stole credit for her work, and spread false claims about her abilities. JPMC Managing Director, Community and Business Development Kevin Thomas openly made crude sexual remarks about Ms. Winfrey, including a vulgar comment about her being "good on her knees," while Jay Bailey, President and CEO of the RICE Center – a key strategic partner and client of JPMC –, relentlessly sent graphic, sexually inappropriate messages to Ms. Winfrey—misconduct that the Company repeatedly ignored. Despite Ms. Winfrey's complaints, JPMC protected the harassers, shielded and exalted the abusers, and punished Ms. Winfrey for speaking out.

5.      JPMC's retaliation was swift and severe. After reporting racial discrimination, gender discrimination, and sexual harassment, Plaintiff was excluded from key projects, given a baseless performance improvement plan, subjected to unwarranted scrutiny, and ultimately forced into medical leave due to the toxic environment. Meanwhile, Mr. Taylor—the very man who had harassed and demeaned her—was rewarded with a promotion. Even after returning to work, JPMC continued its campaign of retaliation, cutting Ms. Winfrey's compensation, denying her promotions, attempting to discredit her professionally, and creating barriers that made her job much more difficult to perform. Ultimately, Ms. Winfrey was retaliatorily terminated by JPMC.

6.      This lawsuit seeks to hold JPMC accountable for its brazen hypocrisy—for publicly championing diversity and inclusion while privately allowing discrimination and harassment to flourish.

7.      For these reasons, Plaintiff brings claims under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.,* and the Atlanta Human Relations Ordinance ("AHRO"), Chapter 94 of the Atlanta Code of Ordinances, for race discrimination, gender discrimination, sexual harassment, and retaliation. Ms. Winfrey seeks all available monetary, equitable, and/or injunctive relief for Defendant's violations.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship.

9.      This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §1331 because Plaintiff is asserting claims arising under federal law, specifically 42 U.S.C. §1981 and the FMLA.

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant JP Morgan Chase & Co. is headquartered in New York, New York. Moreover, a substantial part of the events and omissions giving rise to the claims occurred in this district, including decisions and conduct directed by senior executives based in New York, as well as marketing efforts, client events, and strategic meetings involving Plaintiff that occurred in, or were directed from, New York.

## ADMINISTRATIVE PREREQUISITES

11.      Contemporaneously with the filing of this Complaint, Plaintiff will file a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging

violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, based on race and gender discrimination, harassment, and retaliation.

12.     Once Plaintiff receives a Notice of Right to Sue from the EEOC, Plaintiff will seek leave to amend the pleadings to include claims under Title VII.

## PARTIES

13.     Plaintiff Rashida Winfrey is a citizen of Georgia.  At all relevant times, Plaintiff worked for Defendant and met the definition of an "employee" as the term defined by the applicable statutes.

14.     Defendant JP Morgan Chase & Co. is a Delaware corporation headquartered in New York, New York.  At all relevant times, JP Morgan Chase & Co. met the definition of and was Plaintiff's "employer" as that term is defined by all applicable statutes.

## FACTUAL ALLEGATIONS

**I.     Ms. Winfrey's Impressive Background and Employment History**

15.     Ms. Winfrey joined JPMC in November 2020 with nearly 20 years of experience in finance.

16.     After graduating with a Bachelor's of Business Administration degree from the University of Georgia in 1998, Ms. Winfrey earned her Master's in Business Administration degree from the historically black college (HBCU), Clark Atlanta University in 2001.

17.     She then embarked on an impressive career encompassing various leadership roles within Fortune 500 companies, non-profits, and government entities.

18.     Ms. Winfrey began her career at Bank of America as an Assistant Vice President, within the Global Wealth and Investment Management Team.

19.     She enjoyed subsequent roles of increasing responsibility at PNC Bank, where she was recruited by the consumer bank division CEO to co-lead Mergers & Acquisitions/Local Integration in the southeast region.

20.     In 2018, Ms. Winfrey was asked by the Mayor of Atlanta, Keisha Lance Bottoms, to interview for the city's Executive Leadership Cabinet in the dual role of Chief Service Officer/Director of Corporate & Non-Profit Partnerships.  Ms. Winfrey was also tasked with stepping in to lead initiatives to ensure the survival of Atlanta businesses during the COVID-19 pandemic.

21.     Impressively, Ms. Winfrey has played a national role in shaping programs and advising on White House policy affecting broader communities—work that earned recognition through multiple national awards.

22.     In November 2020, at a time when corporate America's response to systemic racial injustices and inequities came to the forefront and was closely watched following the tragic murder of George Floyd, JPMC hired Ms. Winfrey as one of the first employees to work on a new initiative in service of the JPMorgan Chase $30 billion Racial Equity Commitment ("REC").  Plaintiff caught the attention of Kevin Thomas, the Managing Director of JPMC's Community and Business Development, with her work on a collaborative project between the City of Atlanta and JPMC.

23.     As the Company lacked community-level ties to Atlanta, JPMorgan Chase leveraged Ms. Winfrey's well-established relationships within the local community to build upon the trust she garnered through her years of corporate and business leadership.

24.     Ms. Winfrey joined the Company in the role of Senior Business Consultant for Minority Entrepreneurs,[1] and was hired by National Field Manager for Minority Entrepreneurs

---

[1]     Ms. Winfrey's title was later changed to "Senior Business Consultant for Underserved Entrepreneurs." In approximately January 2023, it was changed to "Senior Business Consultant" ("SBC") to remove any reference to race.

Mikal Quarles. Before she was hired, Ms. Winfrey specifically asked Mr. Quarles about how her performance would be measured and whether she would be subject to sales goals. He assured her that there would be no sales goals for the role, and that she would be evaluated based on the impact of her work on minority business owners.

25.     Ms. Winfrey's functions in her role included: leveraging her knowledge of banking processes and operations to help build JPMC's minority/underserved program; using her vast network to establish strategic contacts for the program; getting stakeholders aligned around a strategic vision; and leading collaborative teams in implementing large-scale initiatives.

26.     Though based in Atlanta, Ms. Winfrey's role included national responsibilities that regularly involved New York-based executives and operations. At various points throughout her tenure, Ms. Winfrey was responsible for responding to client leads from across the country, including a substantial number originating in New York. Ms. Winfrey also supported New York-based client events and received work-related assignments connected to panels and conferences held in New York. On several occasions, Ms. Winfrey traveled to New York for JPMC sponsored events, where she interacted with senior executives headquartered in New York.

27.     Ms. Winfrey was also tasked with developing events and non-profit partnerships to further the goal of coaching and helping minority entrepreneurs gain access to capital.

28.     The Company used Ms. Winfrey's experience and cultural connections to help sell and serve as the face for the JPMorgan Chase Minority Entrepreneur Program.

29.     Ms. Winfrey was rewarded for her hard work and accomplishments when she received the One Chase Award in February 2022, which recognized her significant contribution to the Atlanta market. Ms. Winfrey garnered this award following a vote by her leadership and peers.

30.     Jennifer Piepszak, current Chief Operating Officer, was told that Ms. Winfrey was an invaluable part of the Southeast ("SE") team by Ms. Winfrey's colleagues during a breakfast with the Atlanta Market Leadership Team (MLT) Leaders, after which several MLT members informed Ms. Winfrey that she had been openly described as a high performer and leader within the market by individuals at the breakfast.

31.     Even Jamie Dimon, JPMC's CEO, personally thanked Ms. Winfrey for her contributions to the Company during an April 2023 event in Atlanta that was livestreamed across the Company.

## II.     JPMC Fails to Fulfill Its Racial Equity Initiative

32.     Ms. Winfrey's assimilation into the Company went relatively smoothly; that is, until she began to question business practices and report gender-based harassment.

33.     From approximately February 2021 to September 2021, Ms. Winfrey reported directly to Sean Ramasaywak, East Division Area Manager Coaching For Impact. Mr. Ramasaywak was based in New York and exercised supervisory authority over employees across multiple regions, including Ms. Winfrey.

34.     Early on, Mr. Ramasaywak engaged in a pattern of discriminatory and demeaning conduct toward Ms. Winfrey and other Black women on her team. For instance, Mr. Ramasaywak spread a rumor that Ms. Winfrey was in the "wrong role," a loaded and patronizing assertion that implied Ms. Winfrey's intellectual acumen and leadership style were a poor fit for the position even though she was excelling in her role.

35.     Given Ms. Winfrey's race and gender, Mr. Ramasaywak's comment served to both undermine Ms. Winfrey's credibility and reinforce harmful stereotypes that Black women should be deferential in the workplace.

36.    When Ms. Winfrey confronted Mr. Ramasaywak and asked why he treated her differently than her male peer, Mr. Taylor, Mr. Ramasaywak responded candidly and unapologetically: "because I like Shea [Taylor] more." This admission made it clear that Mr. Ramasaywak favored the men on the team.

37.    Indeed, Mr. Ramasaywak's discriminatory bias against women, particularly Black women, was not isolated to Ms. Winfrey. Another highly credentialed Black woman on Ms. Winfrey's team ultimately resigned under Mr. Ramasaywak's management after enduring constant belittlement, which included Mr. Ramasaywak repeatedly questioning whether she had *actually* attended Harvard University.

38.    The race and gender-based harassment and discrimination that Ms. Winfrey endured under Mr. Ramasaywak was reflective of a broader, entrenched pattern and practice at JPMC. The Company fostered a culture in which senior leaders, many of whom operated out of the Company's New York headquarters, routinely protected male employees who engaged in discriminatory conduct, while punishing the women and people of color who dared to speak out.

39.    As referenced above, the JPMC Racial Equity Commitment ("REC") was a public pledge made by the Company in the aftermath of the tragic deaths of George Floyd and Breonna Taylor to provide $30 billion in funding to minorities and/or minority causes and initiatives to help close the racial wealth gap among Black, Hispanic, and Latino communities via incremental lending and equity investments.

40.    JPMC widely publicized that the objective of this initiative was to "help close the racial wealth gap and advance economic inclusion among Black, Hispanic, and Latino customers and communities that are underserved in the U.S."[2]

---

[2]    See https://www.jpmorganchase.com/about/racialequity#:~:text=In%20addition%20to%20our%20ongoing,communities%20that%20are%20underserved%20in (last visited September 1, 2025).

41.     Much to Ms. Winfrey's dismay, JPMC made little effort to live up to its so-called commitment to racial equity in banking practices.

42.     In reality, JPMC provided **less lending to minorities** after its public commitment than before.

43.     The stated lending commitment was to "provide an incremental $2 billion" in 15,000 "loans to businesses in majority Black and Hispanic/Latino communities, over and above the 2019 baseline" of $1.35 billion in such loans.[3]

44.     However, instead of an incremental positive $2 billion change, by December 2022, the amount of loans provided by JPMC to these minority communities was **lower** than the 2019 baseline.

45.     In 2022, the overall total loans to minorities had been **reduced** by $1.18 billion from what it was in 2019, which was before the REC was even announced.

46.     The results were so paltry that any mention of business loans was hidden from JPMC's website touting the Racial Equity Commitment's "progress".[4]

47.     Groups such as the SOC Investment Group – a JPMC investor who pushed for JPMC to commit to the REC proposal following a racial discrimination lawsuit against the Company that resulted in a $55 million settlement – criticized the REC's lack of progress and called for an audit of the program— an effort supported by over 40% of JPMC's shareholders.[5]

---

[3]     See https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/documents/esg_rec_table_tagged.pdf (last visited September 1, 2025).
[4]     See https://www.jpmorganchase.com/about/racialequity (last visited September 1, 2025).
[5]     See https://www.responsible-investor.com/jpmorgans-racial-equity-audit-criticised-by-soc-investment-group/ (last visited September 1, 2025).

48.     Ms. Winfrey's colleagues would even complain to her that minority business owners were openly expressing their disappointment with JPMC's empty promises and lack of funding (besides offers of high interest credit cards).

49.     On multiple occasions, Ms. Winfrey conveyed this frustration to JPMC executives, including Mr. Quarles and Robert Hines, Ms. Winfrey's boss and the South Region Area Manager, but Mr. Quarles and Mr. Hines made it clear that the Company's public image was far more important than any effort to "close the racial wealth gap."

50.     For instance, during a hybrid event held in New York City, with satellite locations throughout the country, for the Minority Entrepreneur Mentee Graduation in the first quarter of 2022, a minority business owner from New York expressed her dismay about not receiving funding through the REC program to Ben Walters, JPMC's New York-based Business Banking division's CEO.  In response, JPMC leadership prohibited minority business owners from speaking at any community outreach events across the country, particularly those which included JPMC senior leaders, ***unless they were "vetted" and promised to speak positively about JPMC***.

51.     Similarly, minority business owners who were critical of the REC, such as Ryan Wilson, the well-respected owner of The Gathering Spot business club in Atlanta, were branded as "radicals" by JPMC management, including Mr. Quarles and Mr. Ramasaywak.

52.     Mr. Wilson publicly asked JPMC during a meeting to publish "the numbers" of minority businesses approved for loans.

53.     Subsequently, when Mr. Wilson inquired about business lending he was verbally discouraged from submitting a formal loan application, and prevented from undergoing the underwriting process, in direct violation of the Equal Credit Opportunity Act and squarely contrary to the goals of the REC.

54.    When Mr. Wilson was forced to sell a portion of his business for funding, this created a national media firestorm.

55.    When Ms. Winfrey raised concerns with Mr. Ramasaywak and Mr. Quarles that JPMC leadership was breaking the trust that she had been instrumental in fostering within the minority entrepreneur community in Atlanta, her complaints fell on deaf ears.

56.    She protested Mr. Ramasaywak's mischaracterization of potential Black clients who questioned the REC as "radical," and objected to the use of the phrase to diminish and silence Black clients and potential clients like Mr. Wilson, who was discouraged from ever applying for a loan because he simply had a differing opinion.

57.    Behind the scenes, however, JPMC leadership, including Mr. Quarles, painted Black clients and potential clients as "unable to be helped" because "they spent too much money and did not pay their bills."

58.    Similarly, Ms. Winfrey's boss, Robert Hines, did not hide his lack of commitment to the REC, and would openly question "why these people think we owe them something?" When Ms. Winfrey reminded him that it was JPMC who made the very public commitment to "help close the racial wealth gap," Mr. Hines responded by saying, "the firm never should have made the $30 billion commitment to begin with."

59.    Reflecting its patronizing and paternalistic attitude toward minority entrepreneurs, JPMC insultingly portrayed minority business owners as helpless and in need of saving by JPMC in the media through its coordinated marketing strategies.

60.    In many instances, Ms. Winfrey needed to re-write the messaging proposed by external marketing firms to restore dignity to members of those minority communities to whom she vowed to help by accepting a position with JPMC.

11

61.     At the same time JPMC showcased its Black clients in Atlanta's rougher inner-city neighborhoods and lauded the Company's focus on racial equity, Mr. Dimon hosted Company-sponsored events with mostly white attendees held in former slave plantations on the wealthy side of town.

62.     In one instance, in May 2021, Marshall Thomas, professionally known as DJ Mars, a world-renowned musical entrepreneur and touring DJ to Usher, Monica, and other A-list celebrities, was selected to be featured in a JPMC digital and radio promotional campaign touting the work of JPMC's Minority Entrepreneurs program. JPMC did not offer Mars payment for his time, story, or likeness, which was different from how JPMC engaged other white influencers who partnered with the brand.

63.     The initial version of the advertisement condescendingly stated that "a desire to understand how business works led Mars to Ms. Winfrey," dismissing DJ Mars's 25 successful years as an entrepreneur.

64.     Ms. Winfrey objected to this statement and petitioned Mr. Ramasaywak for the language to be changed to honor DJ Mars's success as an experienced business owner and uphold his dignity.

65.     In another instance, in June 2021, Ms. Winfrey openly clashed with the Company's non-Black marketing team when it suggested a promotional campaign for a virtual Juneteenth event, with many team members being in New York.  The marketing team wanted to promote the event by juxtaposing how slaves helped each other along the Underground Railroad with how JPMC was guiding Black entrepreneurs to help each other through better networking.

66.     Ms. Winfrey complained that this strategy was deeply offensive – a sentiment shared by many others outside JPMC, including Natalie Coefield whom President Biden appointed as the National Head of Women's Business for the Small Business Administration ("SBA").

67.     Ms. Winfrey had invited Ms. Coefield to participate in a panel discussion during the Juneteenth event.

68.     However, JPMC required Ms. Coefield, a Black woman, to "practice" for her appearance, but did not require the same for Marc Morial, the President of The National Urban League.

69.     Ultimately, due to her disagreement with JPMC's Juneteenth marketing strategy of tying slavery to entrepreneurship, coupled with the disparate treatment she experienced in being mandated to "practice" for her appearance on the panel, Ms. Coefield declined to participate in the event. When Ms. Winfrey asked Mr. Ramasaywak why Ms. Coefield had been treated differently than her male counterpart, she was dismissively told that "it wasn't [her] business."

70.     Ms. Winfrey expressed her concerns about how REC was never properly set up, managed, or funded in order to succeed to Mr. Ramasaywak and Mr. Quarles.

71.     Unsurprisingly, in 2025, JPMC announced that it was abandoning its equity commitments and rolling back its Advancing Black Pathways initiative, something which the Company ultimately admitted it was already beginning to move away from starting as early as 2023.

**III.     Ms. Winfrey is Discriminated Against and Harassed Because of Her Race and Gender**

72.     Solidifying the target on her back for her efforts to hold the Company accountable for failing to meet its racial equity commitments, Ms. Winfrey's experience at JPMC became drastically worse in January 2022 after she reported a male colleague's gender-based harassment.

73.    Specifically, Ms. Winfrey had been subjected to a misogynistic campaign of harassment by a long-tenured JPMC employee named Samuel "Shea" Taylor, Senior Business Consultant.

74.    Although he held the same title as Ms. Winfrey, Mr. Taylor openly treated her like a subordinate, constantly criticizing her work in front of peers and leadership, and even regularly poaching her clients and assigned partner relationships — all behaviors to which neither male nor white female counterparts were subjected.

75.    Mr. Taylor regularly belittled and spoke ill of Ms. Winfrey to colleagues, urging them not to work with her. He disparaged Ms. Winfrey's mathematical abilities – despite her MBA in finance and extensive experience in banking – by baselessly accusing her of not being "good with numbers."

76.    Such comments were grounded in the stereotype that women are less adept at math than men.

77.    Mr. Taylor even once deliberately spoke over Ms. Winfrey when they were on an "Advancing Black Pathways" panel, preventing her from addressing financial aspects of the subject matter.

78.    For months, Ms. Winfrey quietly endured Mr. Taylor's harassment, remaining focused on excelling in her role, despite his efforts to demean her and thwart her success.

79.    However, a particularly egregious incident in October 2021 left Ms. Winfrey with no choice but to complain to the Company's human resources department ("HR") about Mr. Taylor.

80.    On or around October 19, 2021, Ms. Winfrey attended an offsite work function in Texas with JPMC colleagues, including Mr. Taylor. After dinner, Ms. Winfrey spoke with her invited guest, Black former Dallas City Councilwoman, Tiffinni Young, when Mr. Taylor, always

seeking ways to harass Ms. Winfrey, suddenly approached the two women and positioned himself uncomfortably close to Ms. Young.

81.    Ms. Young politely asked Mr. Taylor to give her some space.

82.    Instead of moving, Mr. Taylor proceeded to introduce himself and speak to Ms. Young in an aggressively flirtatious manner.

83.    Uninterested in Mr. Taylor's advances, Ms. Young again asked Mr. Taylor to get out of her personal space.

84.    Upon hearing this, Mr. Taylor became irate and began shouting at Ms. Young, *__loudly calling her a "bitch.__"*

85.    Ms. Young and Ms. Winfrey both became visibly upset.  Mr. Hines (who was not yet Ms. Winfrey's direct supervisor at the time) stepped in and asked Mr. Taylor to "[l]eave them alone."

86.    Immediately prior to this unfortunate incident, Mr. Quarles, who was Ms. Winfrey's supervisor at the time, had already reprimanded Mr. Taylor in front of the group for harassing Ms. Winfrey, saying, "[w]hy don't you just leave Rashida alone?"

87.    On a separate occasion in approximately September 2021, another Atlanta-based Business Banking Area Manager, Winston Campbell, also reproached Mr. Taylor to stop harassing Ms. Winfrey.

88.    However, Mr. Quarles failed to take any corrective action against Mr. Taylor.

89.    Rather, Mr. Quarles advised Ms. Winfrey to "stay as far away from [Mr. Taylor] as possible."

90.    Such advice was farcical, of course, since Ms. Winfrey and Mr. Taylor worked on the same team.

91.     Moreover, Mr. Quarles was placing the burden on Ms. Winfrey, the target of the incessant harassment, to remedy the situation, as opposed to Mr. Taylor, the clear wrongdoer – far different from how the Company has handled conflicts of this nature involving white females.

92.     Mr. Taylor's behavior on October 19, 2021, was not his first such outburst, but merely another incident in a long line of inappropriate comments he made to non-white female employees and potential partners.

93.     JPMC management was unquestionably aware of Mr. Taylor's misconduct but turned a blind eye to his mistreatment of Ms. Winfrey and other women. Even Mr. Quarles, who hired Mr. Taylor against the advice of others at the Company, openly referred to Mr. Taylor as a "bad hire."

94.     Shortly thereafter, in November 2021, Ms. Winfrey requested FMLA leave after feeling completely unsupported and unprotected by her employer and supervisor.

95.     When she returned to work in early January 2022, Ms. Winfrey formally reported the October 19, 2021, incident along with Mr. Taylor's history of harassment towards her and other women.

96.     An HR representative promised Ms. Winfrey that JPMC would initiate an investigation.

97.     Several weeks later, however, Ms. Winfrey was told that HR would not be speaking to Ms. Young about the incident because Ms. Young was not a JPMC employee, abruptly concluding the investigation by finding no evidence of harassment or a hostile work environment.

98.     After Ms. Winfrey filed her complaint with HR, Mr. Quarles ceased nearly all interactions with her.

99.    Mr. Quarles stopped assigning Ms. Winfrey to work on high-profile, high-visibility projects and events, such as the National CPA conference, the Market Leadership Team, and C-suite Town Hall planning teams.

100.    Mr. Quarles excluded Ms. Winfrey from testing new initiatives such as the call center — a centralized group to handle work overflow created after Ms. Winfrey specifically identified the need for a call center to Mr. Quarles — and the Business Banking Leadership Development program.

101.    Moreover, like Mr. Taylor, Mr. Quarles pressured others not to work with Ms. Winfrey.

102.    Indeed, the tension was palpable and the retaliation obvious. Managing Director Kevin Thomas noticed that Mr. Quarles hardly spoke to Ms. Winfrey and told Ms. Winfrey he would inquire as to what the problem was.

103.    Mr. Thomas suggested that the reason why Ms. Winfrey was being ostracized was that she had been "fly" back "when JPMC hired [her]," but now was not now – a reference to Ms. Winfrey's fluctuating weight caused by the mistreatment she experienced at work which drained her energy to keep her hair straightened, as Mr. Thomas indicated was "preferred."

104.    Mr. Thomas later reported that Mr. Quarles admitted that he was treating Ms. Winfrey poorly ***because she had gone to HR to handle the "situation" with Mr. Taylor***.

105.    Ms. Winfrey explained to Mr. Thomas how she had no choice but to go to HR since Mr. Quarles and other leaders refused to address Mr. Taylor's inappropriate behavior. Ms. Winfrey also mentioned to Mr. Thomas how Mr. Taylor's inappropriate behavior was not directed towards white women.

106.    Mr. Thomas agreed and said, ***"If he were my employee, he would have been gone a long time ago."***

107.    It is notable that Ms. Winfrey was not the only female employee for whom Mr. Taylor created a gender-based hostile work environment that the Company failed to remedy.

108.    On March 3, 2022, Ms. Simmons and Ms. Ding came forward and complained to their manager, Cesar Abadia, Banking Business Relationship Executive, and Mr. Taylor's manager, Sandra Magallon, Midwest Area Manager, respectively, about Mr. Taylor's unlawful behavior.

109.    They too explained how he had belittled them, stolen their clients, fostered discord, and consistently imposed his will over them – behavior he did not exhibit towards male colleagues.

110.    Disappointingly, when Mr. Abadia informed Ms. Magallon, she did nothing, and upon information and belief, failed to even report these women's concerns to HR, which differed from how Mr. Taylor's behavior towards non-Black and male employees was handled.

111.    For example, Mr. Taylor reported being reprimanded by Mr. Quarles for comments he made to a white employee, and how he was publicly corrected for comments he made to a male employee at a team lunch in Atlanta.

112.    Mr. Taylor was once again, to no one's surprise, pardoned from any semblance of corrective action regarding his behavior towards Ms. Simmons and Ms. Ding.

113.    Due to the Company's inaction, Ms. Simmons and Ms. Ding ultimately resigned to escape Mr. Taylor.

114.    Mr. Taylor's conduct was so corrosive that both women have left the industry altogether despite their long careers in banking.

IV.    **Ms. Winfrey Continues To Excel Despite Incessant Harassment and Discrimination**

115.    Even in the face of these deeply troubling issues in the workplace, Ms. Winfrey continued to excel in her position.

116.    In her December 2021 performance review, Ms. Winfrey received the highest rating of "strong" in all but one category.

117.    Months later, in February 2022, Ms. Winfrey was formally recognized for her outstanding performance by being presented with a One Chase Award.

118.    Ms. Winfrey was recognized again in May 2022 by being selected by the Regional Government Affairs Lead Rick Mahler and Atlanta market leaders to participate in the "DC Congressional Fly-In," and meet with high-level federal government representatives and members of Congress to discuss topics including JPMC's Racial Equity Commitment.

119.    Commensurate with her contributions and value to the Company, Ms. Winfrey was the only Vice President selected to attend. Ms. Winfrey was often included as part of regional leadership decisions.  All other participants were two levels above Ms. Winfrey, at the Managing Director or higher level.

120.    Ms. Winfrey's work during the Congressional Fly-In was so stellar that she was later tapped by Mr. Mahler to help the National Government Affairs team, and specifically Elizabeth Herman, Executive Director of Federal Government Relations, to help prepare talking points and serve as a liaison for Jamie Dimon's subsequent White House visit.

121.    By this time, Ms. Winfrey was seen as a valued resource by JPMC teams across the country.

122.    This included the Chase Sapphire Credit Card Team (the "Sapphire Team") who frequently sought Ms. Winfrey's expertise on the southeast expansion strategy, a project aimed at

opening more Chase Sapphire airport lounges. The Sapphire Team hoped to build a Chase Sapphire lounge within the busy Atlanta airport, a critical project given that American Express was set to open its own airport lounge.

123.    The Sapphire Team valued Ms. Winfrey's understanding of the southeast market and knowledge of airport operations – knowledge she gained during her time serving on the City of Atlanta Mayor's Cabinet.    The Sapphire Team even name-dropped Ms. Winfrey during its negotiations with Atlanta Airport.

124.    The Company turned to Ms. Winfrey again when it feared that a group of Atlanta-based customers were about to sue it for discrimination.

125.    JPMC C-Suite leaders traveled to Atlanta to strengthen relationships with the Atlanta community, and the Company gathered a group of community leaders who were receiving funding from JPMorgan Chase for their foundations. The community leaders were led to believe that this was a routine check-in conversation but was really an attempt by the Company to "shore up" community support prior to the filing of the anticipated explosive, high-profile lawsuit.

126.    To put it differently, JPMorgan regarded the funding it gave to these non-profit organizations as "hush money" and insurance in the event public opinion turned against the Company.

127.    The Company asked Ms. Winfrey to yet again put her reputation and goodwill on the line and contact the Mayor of Atlanta's office to arrange a call between Mr. Dimon and the Mayor, hoping that Mr. Dimon could solicit support once the word about the customer discrimination lawsuit surfaced.    The Mayor's office was unresponsive to this request.

128.    Then, in August 2022, Ms. Winfrey was selected by the Executive Director, Southeast Region Media Relations, Alison Reed, to represent JPMorgan Chase during a live

television segment that appeared nationally on the Cheddar News Network, which reached an audience of approximately 6.5 million viewers per month.

**V.    JPMC Retaliates Against Ms. Winfrey For Engaging in Protected Activity**

129.    On September 19, 2022, Vaughn Lucus became National Field Director for Underserved (Minority Entrepreneurs) Business Banking at JPMC.

130.    Mr. Lucus's goal was widely understood to be transforming Ms. Winfrey's team more into a sales function, given his previous success as a sales manager.

131.    Ms. Winfrey viewed this change in leadership as an opportunity to address the hostile work environment she endured.

132.    Ms. Winfrey reached out to Mr. Lucus to request advice on how to handle Mr. Taylor's ongoing harassment.

133.    After the request was forwarded to HR, JPMC appointed a mediator to meet with Ms. Winfrey on September 29, 2022.

134.    Ms. Winfrey told the mediator that she "*get[s] anxiety having to work with Shea*" and has "*seen him curse women out, call them bitches, all types of things.*"

135.    She also reported experiencing heart palpitations when working with Mr. Taylor, particularly after she and JPMC management witnessed Mr. Taylor violently elbow a female employee to get her out of his way at an Atlanta restaurant in December 2022 so he could sit closer to Executive Jenn Roberts, CEO of Chase Consumer Banking.

136.    She also shared that Mr. Taylor often spoke about how he wanted to "gain power," by sabotaging female colleagues, pointing to an incident in which he baselessly accused Ms. Winfrey of being "unethical" during a conference call with peers and leadership.

137. After their meeting, the mediator concluded that mediation was not the best solution to address Ms. Winfrey's issue because "greater measures were warranted."

138. Accordingly, he referred the case back to Dawn Newton, Vice President of Employee Relations. In turn, HR purportedly reopened its prior investigation into Ms. Winfrey's complaints, before unsurprisingly concluding on January 26, 2023, that "there [was] no evidence of a Code of Conduct violation."

139. After being dismissed by both the mediator and now HR, Ms. Winfrey was no closer to achieving a resolution to her complaints about Mr. Taylor's sexist behavior.

140. Notably, Dejuan Palmer, Vice President of HR, informed Ms. Winfrey that although they did not conclude that Mr. Quarles had mistreated Ms. Winfrey, their investigation involved interviews with numerous other employees, and because of those interviews, there would be "consequences" for Mr. Quarles, who was coincidentally removed from team leadership and demoted weeks later.

141. With his discriminatory conduct still wholly unchecked, a defiant Mr. Taylor excluded Ms. Winfrey from a November 8, 2022, roundtable discussion with a divisional Market Director regarding the Racial Equity Commitment initiative.

142. Although the discussion related directly to Ms. Winfrey's work, Mr. Taylor, who organized the event, denied Ms. Winfrey the ability to participate.

143. Tellingly, **the other women who made complaints about Mr. Taylor - Ms. Ding and Ms. Simmons - were also excluded from this event**.

144. Ms. Winfrey expressed her outrage about the retaliatory exclusion to Mr. Lucus and Mr. Hines in multiple emails between October and November 2022, but they both ignored her complaints.

145.    On November 14, 2022, Ms. Winfrey had a call with Mr. Taylor and their new supervisor, Mr. Hines, who was promoted to South Area Manager, Underserved Entrepreneurs.

146.    On the call, Ms. Winfrey requested to no longer work with Mr. Taylor.

147.    Instead of taking corrective action, Mr. Hines dismissed the request out of hand, scolding the two to figure out a way to work together or "look like idiots" and "go down in flames," and stated that he was not interested in being part of their "suicide mission."

148.    Mr. Hines could not have been any clearer in conveying management's conscious refusal to abide by its obligation to address Ms. Winfrey's protected complaints against Mr. Taylor.

149.    Then, during a November 28, 2022, team dinner attended by Mr. Hines and Mr. Taylor, which was part of a routine market visit to Atlanta by Mr. Hines, Mr. Taylor openly made misogynistic comments to the group  saying that "the women in [his] family knew that the men made the decisions," and that he "conducts [his] romantic relationships with women in the same way" – openly boasting of the control he endeavors to exercise over women.

150.    Mr. Taylor shared that he lived in midtown Atlanta because single women there were "easy targets," and that he told "all [his] women what they should and should not do" because "the men speak and make the decisions, and they are to be quiet."  Mr. Taylor added that this was due to the women's "desperation" that came from living in a "perceived homosexual community."

151.    The next day, Ms. Winfrey complained in writing about these shocking and highly offensive remarks, but Mr. Hines failed to respond.

152.    Mr. Taylor, who was copied on Ms. Winfrey's complaint email, replied that Ms. Winfrey was "taking on a victim mentality" and "always whining."

153.    By early 2023, a fourth female JPMC employee formally complained to her manager, Brigitte Killings, Managing Director, Community and Business Development—South

Division, about being sexually harassed by Mr. Taylor. Ms. Killings then spoke to Mr. Lucus about taking protective action against Mr. Taylor.

154.    Yet, Mr. Taylor still was not disciplined. In fact, Mr. Lucus did not even escalate this additional harassment complaint to Mr. Taylor's boss at the time, Mr. Hines, but ignored it completely.

**VI.    JPMC Management Continues to Actively Turn a Blind Eye to Mr. Taylor's Harassing Conduct Towards Women, Emboldening Him and Other Men to Behave Even Worse**

155.    In February 2023, Mr. Taylor interjected himself into a branch grand opening planning meeting for which he was not invited and was beyond his purview.

156.    Ladonna Murphy, Branch Network Market Director, expressed frustration that her directions were being disregarded by Mr. Taylor even though she was a JPMC Executive Director with oversight for that location.

157.    Soon thereafter, Mr. Taylor showed up unexpectedly to another closed-door event led by Ms. Murphy involving the Atlanta Hawks to which he was not invited.

158.    Though Ms. Murphy was in a more senior role than Mr. Taylor and was vested with overseeing Atlanta market branches and coordinating offsite work events, in Mr. Taylor's eyes, she was simply another woman over whom he could exert his will.

159.    Mr. Taylor's attempts to sabotage and tear down women became so well known that during an event planning meeting, it was reported that security was briefed on what to do if Mr. Taylor attempted to gain access to events hosted by Ms. Winfrey or other female employees.

160.    Despite the insurmountable evidence that Mr. Taylor's behavior towards women was patently unlawful, if not outright dangerous, when Ms. Winfrey once again complained to Mr. Hines on February 14, 2023, nothing was done.

161.    Ms. Winfrey implored Mr. Hines to advise her what she could do differently to placate Mr. Taylor, but he sidestepped the question and instead demeaned Ms. Winfrey by saying, "I always enjoy talking to you. You're just so pure and honest."

162.    At around the same time, Ms. Winfrey sought to put an end to the sexual harassment she was experiencing from a client named Jay Bailey, the President/CEO of The RICE Center, a JPMC partner organization funded by JPMC.

163.    Ms. Winfrey was responsible for overseeing JPMC's relationship with the RICE Center, but from the start of their professional relationship, Mr. Bailey aggressively pursued a romantic relationship with Ms. Winfrey.

164.    Mr. Bailey even falsely suggested to JPMC leaders, including Ms. Piepszak and Jenn Roberts, CEO of Chase Consumer Banking, that he and Ms. Winfrey had previously been in a romantic relationship and that he hoped "she would have become his wife."

165.    As a result, Ms. Winfrey was repeatedly placed in the uncomfortable and embarrassing position of having to clarify to her peers and superiors at JPMC that no such relationship had ever existed.

166.    As such, JPMC leaders, including Ms. Piepszak and Ms. Roberts, were put on notice of the incessant harassment Ms. Winfrey was facing but failed to protect her.

167.    On February 21, 2023, having had enough, Ms. Winfrey sent an email to Mr. Bailey asking that he cease sending her text messages which were sexual in nature and spoke about her in a way that suggested they had a romantic relationship.

168.    Examples of Mr. Bailey's disgusting, sexually harassing text messages include, but are not limited to:

- "I've been wanting you for years."

- "Pleeeeasse wear that lil dress I like!!"

- "Now I have to go through the heartbreak and jealousy AGAIN – of you finding happiness without me. Sigh."
- "See. #PullsOutLotionAGAIN."

- "Might want to keep those up. I'm a sprayer," in response to a GIF Ms. Winfrey sent of a woman pulling her sunglasses down her nose and rolling her eyes.

- "Let's meet at a hotel."

169.    Mr. Bailey is a prominent figure in the Atlanta business community who routinely interacts with senior JPMC leaders.

170.    He is often invited to fly on JPMC private jets to New York and is frequently photographed with Mr. Dimon and other C-suite executives, placing his sphere of influence within JPMC many levels above that of Ms. Winfrey.

171.    In fact, Mr. Bailey oversees a JPMC satellite office, known as the Chase Lounge, despite not receiving training from JPMC on protocols and responsibilities required by someone representing the firm.

172.    While JPMC HR acknowledged to Ms. Winfrey that their investigation —initiated following a correspondence from Ms. Winfrey's counsel in 2023 detailing Mr. Bailey's harassment — confirmed that she had been sexually harassed by Mr. Bailey, the Company made clear that there was no plan to remedy the matter nor protect Ms. Winfrey from this harassment.

173.    Mr. Bailey clearly felt emboldened by the Company's practice of turning a blind eye to similar lewd, harassing behavior toward female employees.

174.    In fact, there are similarities between Mr. Bailey's behavior and that of aforementioned JPMC Managing Director Kevin Thomas, who declared that Ms. Winfrey **"looked**

***like she was good on her knees,***" a comment made during the 'Essence Festival' in New Orleans at a moment in which Ms. Winfrey knelt to speak to Mr. Quarles.

175.    Notably, even though the head of Ms. Winfrey's business unit, Mr. Quarles, overheard this atrocious remark, his only reaction was to merely laugh and say, "Man, you are out of control," while walking away and leaving Ms. Winfrey to deal with the traumatic experience on her own.

176.    In fact, Ms. Winfrey was routinely subjected to gender-based insults such as:

- Being publicly berated by Mr. Quarles who would say to her, "You don't know everything," a microaggression insinuating that there was an appropriate time and place for a woman to give her opinion and that this was not one of them, which resulted in Ms. Winfrey fleeing from the venue in tears to call a coworker for solace.

- Comments from Managing Director Kevin Thomas (described above) suggesting that Ms. Winfrey's failure to "straighten her hair" and "no longer be fly," or essentially not dolling herself up, was detrimentally impacting her standing within the Company, along with text messages to Ms. Winfrey commenting on the attractiveness of her married female friends that had nothing to do with JPMC business.

- Being interrupted, cut off, and not allowed to meaningfully contribute to a meeting with a potential client by Mr. Ramsaywak in which she was the only female participant, while at the same time being the only employee asked to serve beverages to the male attendees.

177.    Ms. Winfrey's only avenue of relief during this time was to continue to exceptionally perform her job.

178.    In fact, Ms. Winfrey enjoyed more accolades for her work, being featured in Atlanta Magazine and receiving a prestigious "Women Making a Mark Award" in February 2023.

179.    Even then, JPMC delayed approving Ms. Winfrey's receipt of this award for months, unlike how the Company handled awards given to male employees.

180.    On March 14, 2023, Ms. Winfrey forwarded her earlier September 19, 2022, harassment complaint against Mr. Taylor to Mr. Lucus and Mr. Hines, emphasizing how, since she made this complaint, **four women of color** complained about Mr. Taylor.

181.    Ms. Winfrey's renewed complaint, however, was again met with utter silence.

182.    With management once again giving Mr. Taylor the greenlight to continue to harass women of color with impunity, Mr. Taylor's behavior became increasingly unhinged, forcing female employees to create their own safeguards for their protection.

183.    On April 6, 2023, at a branch grand opening celebration in which two of Ms. Winfrey's clients were honored, a female JPMC Vice President, who too had previously complained about gender harassment by Mr. Taylor, was expected to speak.

184.    This female Vice President was sensitive to the thought of being harassed at a public event as, unfortunately, she had experienced this previously.  However, in that prior incident in which an inebriated male employee falsely suggested in front of colleagues that he had had sex with her the night prior and vulgarly described what he wanted to do to her sexually, this female Vice President's managers seemingly took action against the harasser who was ultimately fired.

185.    Members of the media and certain dignitaries were in attendance for this April 6, 2023, event, which was also set to be livestreamed.

186.    Prior to then, the all-female leadership team for this event told Mr. Hines that they were not comfortable with Mr. Taylor attending the program.

187.    In other words, while JPMC management continued to turn a blind eye to Ms. Winfrey's complaints, women in multiple lines of business and from markets across the country were now burdened with having to concoct elaborate plans on their own simply to protect themselves against Mr. Taylor's undesired and harmful behavior.

### VII.    Mr. Taylor Lodges a Baseless, Retaliatory Complaint Against Ms. Winfrey, Leading to Her Going on FMLA Leave

188.    On April 14, 2023, Mr. Taylor attempted to "turn the tables" on Ms. Winfrey by lodging a baseless complaint against her based on purported "disparaging comments" she made about him to Mr. Hines – a clear allusion to her numerous protected complaints.

189.    Consequently, in or around April 2023, Ms. Winfrey was subjected to two long interrogations over the phone by HR team member Amy Thornton regarding Mr. Taylor's retaliatory allegations, forcing her to painfully recount the traumatic discrimination and harassment she had endured.

190.    Among other things, Ms. Winfrey expressed about Mr. Taylor that: "this is a man that I have seen consistently get angry if women will not bow to his will. I've seen him consistently, from my perspective…try to super impose his will on women."

191.    Following these interviews, Ms. Winfrey sent a detailed email to Mr. Lucus, Mr. Hines, Mr. Quarles, and HR, expressing her outrage at having to defend herself against an obviously retaliatory complaint made by Mr. Taylor, while she herself had tried every possible route to find a resolution to her numerous complaints about his heinous treatment of her and other women at JPMC to no avail.

192.    Ms. Winfrey noted how Mr. Lucus had suggested that she "watch [her] diet and exercise" to manage the stress caused by Mr. Taylor's harassment when she last complained to him.

193.    Ms. Winfrey also cited how numerous managerial employees, including Mr. Quarles, Mr. Hines, and Mr. Thomas, were fully cognizant of Mr. Taylor's harassment, pointing to various remarks from managers like: "Shea [Taylor], why don't you just leave Rashida alone?" (said by Mikal Quarles); "This guy has been allowed to be a menace in the Atlanta market for years,

and this has gone on far too long" (said by Kevin Thomas); and "Shea, you've insulted Rashida from the moment we started this call" (said by Robert Hines).

194.    Ms. Winfrey further described how Mr. Taylor had claimed that his views towards women supposedly were negatively impacted by childhood trauma.

195.    Ms. Thornton indicated that HR would revisit Ms. Winfrey's prior complaints about Mr. Taylor, while Mr. Hines and Mr. Lucus promised to visit Atlanta to address the situation in person. This was, however, all a ruse.

196.    Three days after her harassment complaint, Mr. Lucus and Mr. Hines flew to Atlanta with intentions that went beyond addressing the issues with Mr. Taylor.

197.    Even though he had already been in his role leading the national Minority Entrepreneur team for six months, this was Mr. Lucus's first time visiting Atlanta. Ms. Winfrey had previously begged him to come to Atlanta to offer support regarding her difficulties with Mr. Taylor.

198.    During this "pop-up field visit" to Atlanta – which required Mr. Lucus, who is based in Los Angeles, to literally fly past employees who were well below Ms. Winfrey on the scorecard in order to get to Atlanta – Mr. Lucus ignored Ms. Winfrey's pleas for help as he stared straight ahead at his computer screen when she tried to approach him, callously stating that he was "not an HR specialist."

199.    Though Ms. Winfrey's severe emotional distress was evident, at no time did Mr. Lucus bother to check on her wellbeing.

200.    Instead, Mr. Lucus abruptly changed the subject to Ms. Winfrey's performance, although she was consistently a top performer on her monthly scorecards. He began to harshly and unduly criticize her "client interactions" metric, a new metric recently added to her "scorecard."

201.     Notably, the scorecard Mr. Lucus referenced was later discarded by the Finance team due to inaccuracies, and a new scorecard was later issued to Ms. Winfrey.

202.     Ms. Winfrey's boss, Mr. Hines, interjected multiple times to provide examples of the value of Ms. Winfrey's work.  However, Mr. Lucus was not swayed, indicating that any efforts to protect Ms. Winfrey would not be seen favorably.

203.     Mr. Lucus continued to berate Ms. Winfrey, promising that she "would never be number one on his team," and engaged in a lengthy diatribe that left Ms. Winfrey feeling physically ill and needing to leave the meeting.

204.     Left with no other option, on May 2, 2023, Ms. Winfrey went back on FMLA leave due to the excessive anxiety she was experiencing caused by the Company's concerted effort to retaliate against her for her protected complaints, which interfered with her ability to perform her job.

**VIII.   Rather Than Discipline Mr. Taylor, JPMC Outrageously Promotes Him, While Ramping Up its Campaign of Retaliation Against Ms. Winfrey for Engaging in Protected Activity and Taking Protected Leave**

205.     On July 24, 2023, Ms. Winfrey returned to work in the hopes that JPMC would finally facilitate a workplace that protected women from Mr. Taylor's harassment.

206.     However, Ms. Winfrey was shocked to learn that, while she was on leave, not only did JPMC fail to discipline Mr. Taylor, but the Company *promoted* him to the prestigious Commercial Banking division.

207.     Ms. Winfrey, the only African American woman on her team, on the other hand, was treated once again like a second-class citizen.

31

208.    Despite clearly communicating her return date, making numerous efforts to reactivate email and system access, and sending countless requests for support and direction, Ms. Winfrey was ignored for over two weeks and unable to log on to the JPMC system upon her return.

209.    As a result, Ms. Winfrey was severely hindered from effectively fulfilling her duties.

210.    To make an already stressful situation worse, Mr. Hines then informed Ms. Winfrey that she was required to immediately complete all compliance training sessions that she had missed while on FMLA leave, effectively penalizing her for taking protected FMLA leave.

211.    Similarly, upon her return, Mr. Hines communicated to Ms. Winfrey that she was expected to still catch up to and meet her production goals for those months that she had been on medical leave.

212.    Mr. Hines tried to pressure Ms. Winfrey into committing to a specific timeframe by which she would meet those goals.  Ms. Winfrey expressed her concerns about how this expectation was not outlined in Company policy, extremely difficult to complete on such short notice, and would invariably cause her undue stress.

213.    Furthermore, Ms. Winfrey emphasized that the purpose of the FMLA was not to penalize her for taking medical leave, and that this arbitrary requirement that she make up what amounted to triple the work was "clearly punitive."

214.    Further, during the months Ms. Winfrey was on FMLA leave, she received a rating of "0" on her scorecard, lowering her overall ranking amongst her peers.  As a result, Ms. Winfrey had to endure the humiliation of an inaccurate scorecard that did not reflect her true performance.[6]

---

[6]    A "scorecard" is JPMC's internal performance evaluation system used to periodically assess employees. It incorporates both quantitative metrics (such as productivity, client impact, or error rates) and qualitative assessments (such as teamwork, leadership, and communication). An employee's scorecard rating directly affects their ranking relative to peers and may impact compensation, bonus eligibility, and advancement opportunities.

215.    JPMC's practice of including FMLA leave periods in performance metrics failed to accurately represent Ms. Winfrey's actual work performance.

216.    This not only penalized Ms. Winfrey for taking protected FMLA leave by tarnishing her reputation but severely hindered her advancement opportunities within the Company.

217.    Then, in September 2023, Ms. Winfrey was further penalized when Mr. Hines and Mr. Lucus prevented Ms. Winfrey–the only African American woman on the South Underserved Entrepreneurs team–from attending the annual team offsite event, while including all others who were on the Underserved Entrepreneurs team.

218.    The off-site meeting took place in Tempe, Arizona, and provided attendees with tools, resources, and leadership access that were critical to the functions of their role.  As a result, Ms. Winfrey was placed at a disadvantage by not being afforded the benefits of peer-to-peer learning.

219.    Whereas JPMC covered travel and lodging for all attendees who were invited, Ms. Winfrey offered to cover her own expenses to attend the event and even purchased an expensive plane ticket.  However, Mr. Hines still forbade Ms. Winfrey from attending the event.

220.    On September 29, 2023, Ms. Winfrey lodged a complaint with HR regarding the retaliation she faced after returning to work from her FMLA leave.

221.    She notified HR how she confronted Mr. Hines about subjecting her to different, unfair standards regarding meeting performance metrics that accrued while she was on FMLA leave, explaining how she "told [her] manager that this demand 'sounded illegal,' to which he replied that '[she] shouldn't use that word.'"

222.    Ms. Winfrey wrote: "I am being set up to fail, and I cannot help but feel that JPMC is turning a blind eye to the unfair, and unlawful treatment I have endured. I put you on notice of

these additional issues in the hopes that you will address them, and provide me with some clarity and assistance, so that I can continue to perform my role satisfactorily."

223.    Just **three days** later, on October 2, 2023, Ms. Winfrey was issued a baseless performance improvement plan ("PIP") by Mr. Hines and Mr. Lucus.

224.    Though it is customary for a direct manager to review a PIP with the employee to which it is being issued, surprisingly, Ms. Winfrey's skip level manager, Mr. Lucus, discussed the PIP with her, with Mr. Hines apparently having no knowledge of its contents.

225.    Several major flaws with the delivery of the PIP demonstrate the haphazard manner this retaliatory document was thrown together.

226.    For instance, Ms. Winfrey was in the top 20% of the national scorecard in 90% of the categories measured. Further, no end date for the PIP was provided.

227.    In addition, Ms. Winfrey was not given a written copy of the document, nor asked to sign any documents.  Moreover, no coaching or follow-up meetings were scheduled to ensure that she was meeting her PIP expectations.

228.    When Ms. Winfrey attempted to seek clarity and provide her input on the PIP, she was dismissed by Mr. Lucus and simply told that "these items were not up for debate."

229.    Ms. Winfrey subsequently emailed her concerns about the accuracy of and intent behind the PIP to Lee Carney, Americas Employee Relations Partner, stating:

> In the first instance, I have been asking for support and coaching for a long time to no avail. The Minority Entrepreneur/Underserved Entrepreneur/Business Coaching Team which exponentially expanded following the death of George Floyd has been riddled with constant change, dizzying frequent leadership changes, unclear instruction, everchanging measurement metrics and KPIs.  In less than 3 years in the role, I have had 5 manager changes and the role itself continues to morph.

Team calls have been derailed by my peers stopping to complain about the lack of consistency in measurement and instructions. It is commonplace for peers to show up late for meetings, miss meetings altogether with managers asking about their whereabouts DURING the actual meeting and even SBCs working from outside of the United States for months at a time. As such, many of the concerns outlined in the written warning hold me to standards not exhibited by peers on my team.

230. Ms. Winfrey then rebutted each bulleted point in the PIP to show how the alleged concerns in the PIP were unfounded and without merit.

231. Moreover, Ms. Winfrey sent a separate email to Mr. Lucus, Mr. Hines, Ms. Thornton, Tara Williams, Global Head of Employee Relations, and Dawn Newton, Vice President of Employee Relations, detailing how Mr. Lucus repeatedly characterized her behavior as "aggressive" and "intimidating" during their PIP meeting, without providing a single example or any evidence.

232. Importantly, nothing in the PIP indicated that Ms. Winfrey had ever been "aggressive" or "intimidating," rendering this a false and biased characterization painting Ms. Winfrey, the only African American female on her team, as the "angry Black female," a false narrative that could have a "long-term impact on career opportunities as well as [her] mental and physical health."

233. Ms. Winfrey did not receive a response from Mr. Hines or Mr. Lucus to either email.

234. The PIP was merely a tool used to further retaliate against and intimidate Ms. Winfrey into silence, that became part of her employee record and affected her ability to change positions internally.

235. Because of the baseless PIP, Ms. Winfrey was ineligible for promotions, transfers, and awards such as the National Achiever award, and suffered a reduction to her bonus.

236.    Additionally, Ms. Winfrey's day-to-day tasks were effectively changed. Ms. Winfrey was no longer considered part of "leadership," and was relegated to branch level work, which was a clear demotion.

## IX.    JPMC's Campaign of Retaliation Escalates After Ms. Winfrey Retains Counsel and Notifies the Company of Her Legal Claims

237.    The Company's campaign of retaliation intensified after Ms. Winfrey retained counsel and notified JPMC of her legal claims for discrimination, harassment, and retaliation in November 2023, and continued unabated until her April 2025 termination.

238.    For instance, in November 2023, just days after being notified that Ms. Winfrey had retained counsel, JPMC baselessly investigated Ms. Winfrey's corporate card usage, falsely accusing her of leaving the firm to pay for personal hotel expenses and a golf club membership, causing harm to her reputation and embarrassment.

239.    These charges had been approved by the Company months earlier, in July 2022 and January 2023, respectively. Yet, JPMC's Global Security Department aggressively interrogated Ms. Winfrey and ordered her to turn over personal bank statements, including checking and investment account records, to refute these manufactured accusations.

240.    The Global Security Department ultimately determined there was no wrongdoing.

241.    The retaliation reached new heights during Ms. Winfrey's December 2023 annual performance review.

242.    Although her direct manager, Mr. Hines, was supposed to conduct the review, Mr. Lucus led the meeting, with Mr. Hines joining by phone while remaining largely silent, and subjected Ms. Winfrey to a hostile barrage of unwarranted criticism. To put it differently, Mr. Lucus flew to Atlanta for a closed-door meeting with just he and Ms. Winfrey, all *after* Ms. Winfrey had expressed her situational anxiety and reported harassment by Mr. Lucus.

243.    Mr. Lucus refused to allow Ms. Winfrey to refer to her prepared notes, telling her she could speak only when he told her to.

244.    The performance review was filled with incorrect data and false accusations, largely recycling content from the disputed and suspect October 2023 PIP.

245.    Mr. Lucus continued to attack Ms. Winfrey for her lack of production during the months when she was on protected FMLA leave.  Adding insult to injury, the Company manipulated the review system to prevent Ms. Winfrey from responding in writing to the numerous inaccuracies in her performance review.

246.    The Company retaliated further in December 2023 when it failed to award Ms. Winfrey stock options for the first time in her tenure.  Ms. Winfrey's annual bonus was also cut nearly in half.

247.    That same month, the Company passed over Ms. Winfrey for a Treasury Management Executive Director position focused primarily on Atlanta-based relationships — a role for which she was unquestionably and uniquely qualified and which would have been an advancement in her career.  In fact, Ms. Winfrey was recommended for this position by a high-level Atlanta official and was encouraged to apply to it by the hiring manager. The position went instead to a white male.

248.    The Company also continued its pattern of FMLA violations by issuing Ms. Winfrey scorecards that still included production expectations for periods in which Ms. Winfrey was on protected FMLA medical leave.

249.    Ms. Winfrey's managers — Mr. Hines and Mr. Lucus — even admitted that Ms. Winfrey's scorecards could easily be corrected with "literally four simple strokes of keypad," demonstrating the willful nature of these violations.

250.    On February 6, 2024, Ms. Winfrey suffered a severe panic attack after learning that Mr. Hines and Mr. Lucus were traveling to Atlanta to meet with her and was placed on administrative leave.

251.    On or around February 21, 2024, Ms. Winfrey commenced FMLA leave and requested reasonable ADA workplace accommodations.

252.    While Ms. Winfrey was on legally protected leave between February and April 2024, due to the exacerbation of her situational anxiety caused by having to continue working with her harassers, including Mr. Lucus, Mr. Hines, and Mr. Bailey, in April 2024, JPMC quickly pushed through the promotion of a former peer of Ms. Winfrey to Southeast U.S. Area Manager – a promotion that Ms. Winfrey had earned based on her excellent performance.

253.    This promotion was clearly fast-tracked and deliberately pushed through while Ms. Winfrey remained on leave so that the Company had an excuse for why the deserving Ms. Winfrey was not moved into the new role.  This was further retaliation for Ms. Winfrey's decision to engage in protected activity, including by hiring counsel to protect her rights.

254.    In December 2024, Ms. Winfrey was once again subjected to a baseless HR investigation, this time under the guise of alleged "improper use of social media," a charge entirely devoid of merit.

255.    The investigation targeted a LinkedIn post in which Ms. Winfrey publicly celebrated an industry award she had secured on JPMC's behalf. The post featured a photo of the Atlanta leadership team and acknowledged their involvement by tagging them. Ms. Winfrey was scrutinized for allegedly failing to obtain permission to use the group photo and tag her colleagues.  However, suspiciously, the identity of the complainant was never disclosed, particularly as Mr. Taylor, Mr. Lucus, and Mr. Hines had all been actively encouraging others to report Ms. Winfrey to HR.

256. Ms. Winfrey had to waste valuable time being interrogated by HR and submitting documents to yet again prove her innocence. As with *each* previous instance, HR found the manufactured allegations against Ms. Winfrey to be baseless and closed the investigation without finding Ms. Winfrey at fault.

257. Furthermore, Ms. Winfrey's 2024 annual performance review was still unlawfully impacted by production goals from her time on FMLA protected leave.

258. Additionally, Ms. Winfrey repeatedly complained to JPMC leadership, including Rayna Morton, HR Business Partner, Debbie Lawrence, Managing Director of Community Business Strategies and Government, and Mr. Hines, about the ongoing pressure she faced to engage and participate in events at the RICE Center, where Jay Bailey, her sexual harasser, is President and CEO.

259. For instance, in May 2024, Ms. Winfrey was required to attend a JPMC work event in which Mr. Bailey was celebrated as a purported community hero and the featured guest in a fireside chat with JPMC Business Banking CEO Ben Walters.

260. The event was JPMC's largest event in Atlanta in 2024, and further cemented the inextricable relationship between Mr. Bailey, JPMC executives, and Ms. Winfrey's job.

261. Ms. Winfrey complained about this to Mr. Palmer, but nothing was done.

262. In October 2024, Ms. Winfrey was also excluded from attending meetings with Mr. Hines taking place at the RICE Center, with Mr. Bailey in attendance, which two of her Atlanta-based coworkers were able to attend.

263. During Mr. Hines' visit, Ms. Winfrey was also excluded from the Minority Supplier Development Council Conference in Atlanta, even though she had been the local lead on this

organization for many years. Yet again, Ms. Winfrey was the only member of the Atlanta Underserved Entrepreneur Team excluded.

264.    Ms. Winfrey had been invited to the conference by William Kapfer, JPMC's Global Head of Supplier Diversity, who was based in New York and even urged Ms. Winfrey to invite clients and prospects to attend the conference.

265.    However, about 45 minutes after Ms. Winfrey was invited to attend the conference, the invitation was abruptly revoked.

266.    Ms. Winfrey had to embarrassingly uninvite several people she had just invited at his request.

267.    Then, in November 2024, Mr. Bailey intentionally blocked Ms. Winfrey from exiting a store that was a JPMC client. Ms. Winfrey had to pass within inches of Mr. Bailey as she desperately exited the store.

268.    In November 2024, Ms. Winfrey complained to her supervisor, Mr. Hines, about JPMC's abhorrent decision to hold her team's graduation at the RICE Center, which understandably made her feel completely unprotected and vulnerable by the Company.

269.    Shockingly, Mr. Hines claimed that he had never been made aware of Ms. Winfrey's sexual harassment complaints against Mr. Bailey, as well as the firm's findings of sexual harassment by Mr. Bailey, which was particularly concerning because Mr. Hines had the ability to offer support and/or protection based on his position.

270.    Shortly following this complaint, in or around January 2025, Mr. Hines baselessly accused Ms. Winfrey of not having enough clients to be eligible to attend the graduation. The timing of this accusation was particularly suspicious since the graduation had taken place in September 2024 and this was the first time she was hearing of such an issue.

271.    Further, in February 2025, Ms. Winfrey was excluded from a meeting with Mr. Dimon because Mr. Bailey was in attendance. At no time previously had Ms. Winfrey been excluded during Mr. Dimon's Atlanta visits. Conversely, she had previously been a key team member, assuring the success of such visits. Ms. Winfrey promptly complained to Mr. Hines about being excluded.

**X.    JPMC Retaliatorily Terminates Ms. Winfrey's Employment**

272.    In or around January 2025, JPMC once again failed to issue Ms. Winfrey a raise or any equity, unlike her peers.

273.    On January 15, 2025, Ms. Winfrey and JPMC attempted to resolve her claims against the Company but were unsuccessful.

274.    Shortly thereafter, on February 19, 2025, Employee Relations issued Ms. Winfrey yet another retaliatory written warning, this time citing "consistent unsatisfactory performance." The warning was not only unfounded but transparently pretextual.

275.    Strikingly, every alleged performance issue listed in the February 19 warning stemmed from events that occurred in 2024. Yet, none of these concerns were mentioned to Ms. Winfrey prior to her receiving the written warning, despite Ms. Winfrey receiving a performance review on January 6, 2025.

276.    JPMC plainly had ample time and opportunity to raise these purported issues earlier. The sudden emergence of these complaints came only after Ms. Winfrey engaged in protected activity.

277.    Once again, Ms. Winfrey's latest written warning made her ineligible for key internal recognitions, awards, and promotions.

278.    Likewise, to further penalize Ms. Winfrey for engaging in protected activity, JPMC required Ms. Winfrey to pay for part of her travel expenses to attend a March 2025 offsite event in New Orleans, Louisiana, unlike all other attendees.

279.    On April 2, 2025, Ms. Winfrey learned that her colleague, Xamayliz Gonzalez, would be representing Ms. Winfrey's team during JPMC's Atlanta Diversity, Opportunity, and Inclusion ("DOI") call, even though Suganthi Simon, DOI Committee Co-Chair, had represented to Ms. Winfrey that Ms. Winfrey would be the one representing her team.

280.    On April 9, 2025, Ms. Winfrey formally responded to the February 19 warning. In her response, Ms. Winfrey made clear that her job performance had been impacted by her managers' relentless pattern of discrimination and harassment against her. She explained candidly that her "client interactions directly correlate to the time [she was] being harassed more vs. less."

281.    Rather than acknowledge or investigate these serious concerns, JPMC's Employee Relations department ignored Ms. Winfrey's concerns entirely. No follow-up conversation was ever scheduled while she was at JPMC, and no effort was made to assess whether her work environment contributed to the alleged performance issues.

282.    In the week following her complaint, Ms. Winfrey's work was consistently reassigned to Ms. Gonzalez, including work from JPMC's Summerhill branch in Atlanta, GA.

283.    On April 15, 2025, Ms. Winfrey had a bi-weekly call with coworkers, including Ms. Gonzalez and Nicola Roberts. Ms. Winfrey indicated that she wanted to continue ongoing conversations about increased transparency and her work getting reassigned to Ms. Gonzalez.

284.    Ms. Gonzalez indicated that it was important for Mr. Hines to join the call as well to help discuss these issues. Ms. Winfrey insisted that Mr. Hines's presence on the call was not

necessary and that she wished to discuss these issues privately with Mr. Hines and not in the presence of Ms. Gonzalez and Ms. Roberts.

285.    Nevertheless, Mr. Hines joined the call on a few minutes' notice and began pressuring Ms. Winfrey to discuss her concerns. Over a dozen times, Ms. Winfrey insisted that she did not want to have this conversation on the group call but instead wanted to have the conversation with Mr. Hines privately.

286.    Unfortunately, once Ms. Roberts exited the call, Mr. Hines and Ms. Gonzalez continued to pressure Ms. Winfrey to voice her concerns right then and there.  However, when Ms. Winfrey finally spoke about her concerns, Ms. Gonzalez called Ms. Winfrey "aggressive"—an unfortunate but common stereotype for Black women.

287.    Instead of facilitating a productive conversation, Mr. Hines reinforced Ms. Gonzalez's comment, and said, "from where I stand, this conversation seems aggressive."

288.    The following day, April 16, 2025, Ms. Winfrey made a complaint to HR about the call from the day prior.

289.    Ms. Winfrey never received a follow-up regarding this complaint - until *after* her termination that is.

290.    Instead, on April 17, 2025, immediately after raising these concerns, Ms. Winfrey received a brief and abrupt phone call from Mr. Hines and Debbie Lawrence, Managing Director of Community Business Strategies and Government. Without warning or discussion, Mr. Hines and Ms. Lawrence (who was speaking to Ms. Winfrey for the very first time, after ignoring the many emails Ms. Winfrey sent her, which was unlike how she was responsive and proactively communicative with other employees) told Ms. Winfrey that she was being terminated "in accordance with her written warning."

43

291.    This call lasted two minutes. In that brief instance, years of Ms. Winfrey's service, achievements, and dedication to JPMC were discarded like waste into a landfill. Ms. Winfrey's termination had nothing to do with her performance, but was swift, calculated retaliation for her fearlessness and persistence in speaking out against the discrimination, harassment, and retaliation committed by powerful JPMC leaders.

### FIRST CAUSE OF ACTION
### (Discrimination and Hostile Work Environment in Violation of § 1981)

292.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as though set forth fully herein.

293.    As described here, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, treating Plaintiff differently than her white colleagues, and creating a hostile work environment for Plaintiff.

294.    As described herein, Defendant discriminated against Plaintiff because of her race, by, *inter alia*, denying Plaintiff work opportunities that were afforded to her white colleagues, and subjecting her to disparate treatment.

295.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of § 1981, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

296.    Defendant's discriminatory treatment constitutes a malicious, willful, and wonton violation of § 1981 for which Plaintiff is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)

297.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

298.    Defendant retaliated against Plaintiff for engaging in protected activity, by *inter alia*, subjecting her to negative performance reviews, exclusion from career opportunities, terminating her employment, and other adverse employment actions.

299.    As a direct and proximate cause Defendant's unlawful retaliatory conduct in violation of §1981, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

300.    Defendant's unlawful retaliatory actions constitute malicious, willful and wonton violations of §1981 for which Plaintiff is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### (Retaliation in Violation of FMLA)

301.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

302.    Defendant retaliated against Plaintiff for engaging in protected activity by lawfully exercising her FMLA rights by *inter alia*, failing to properly reinstate Plaintiff to the same or equivalent position, imposing heightened, arbitrary performance expectations upon her return, penalizing her for failing to meet metrics accrued during her leave, issuing her meritless performance improvement plans, and terminating her employment.

303.    The timing and nature of Defendant's conduct establish a direct and causal connection between Plaintiff's protected activity and the retaliatory treatment she endured.

304.    Defendant's actions were intentional, willful, and in bad faith, and in violation of 29 U.S.C. §2615(a)(2).

305.    As a direct and proximate result, Plaintiff has suffered and continues to suffer substantial damages, including loss wages, liquidated damages, and attorneys' fees and costs, for which she is entitled to an award.

## <u>FOURTH CAUSE OF ACTION</u>
### (Gender Discrimination and Sexual Harassment in Violation of the AHRO)

306.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

307.    The Atlanta Human Relations Ordinance, specifically Section 94-112, prohibits discrimination in employment on the basis of gender.

308.    Defendant discriminated against Plaintiff based on her gender by subjecting her to less favorable treatment in job assignments, leadership opportunities, and professional advancements.

309.    Defendant discriminated against Plaintiff based on her gender by regularly subjecting her to unwelcome sexual conduct, inappropriate remarks, and degrading treatment based on her gender, creating a hostile work environment.

310.    Defendants subjected Plaintiff to severe and pervasive sexual harassment, including but not limited to, sexually explicit and inappropriate messages, derogatory and sexually suggestive remarks from male colleagues, and failing to take appropriate corrective action in response to plaintiff's numerous complaints.

311.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages including, but not limited to, lost wages, emotional distress, and reputational harm.

312.    Plaintiff seeks all available remedies under the Atlanta Human Relations Ordinance, including compensatory damages, equitable relief, attorneys' fees, and any other relief deemed proper.

## FIFTH CAUSE OF ACTION
### (Race Discrimination and Hostile Work Environment in Violation of the AHRO)

313.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

314.    The Atlanta Human Relations Ordinance, specifically Section 94-112, prohibits race-based discrimination in employment.

315.    Defendant engaged in racially discriminatory practices by treating Plaintiff less favorably than similarly situated employees of other races.

316.    Defendant was denied equal opportunities, excluded from critical professional initiatives, and subjected to different workplace standards based on her race.

317.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages including, but not limited to, lost wages, emotional distress, and reputational harm.

318.    Plaintiff seeks all available remedies under the Atlanta Human Relations Ordinance, including compensatory damages, equitable relief, attorneys' fees, and any other relief deemed proper.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of the AHRO)

319.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

320.    Defendant retaliated against Plaintiff for engaging in protected activity, by *inter alia*, subjecting her to negative performance reviews, exclusions from career opportunities, terminating her employment, and other adverse employment actions.

321.    As a direct and proximate cause Defendant's unlawful retaliatory conduct in violation of the AHRO, specifically Section 94-12, Plaintiff has suffered, and continues to suffer, severe mental and emotional distress for which she is entitled to an award of damages.

322.    Defendant's unlawful retaliatory actions constitute malicious, willful and wonton violations of the AHRO for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enters judgment in her favor and against Defendant, containing the following relief:

A.    A declaratory judgment that the actions, conduct, and practices of Defendant complained herein violate the laws of the United States and City of Atlanta.

B.    An injunction and order permanently restraining Defendant and its officers, officials, agents, successors, employees and/or representatives, and all persons acting in concert with and/or on behalf of them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein.

C.    An injunction and order requiring Defendant to take appropriate action to protect employees, prevent discrimination, sexual harassment, and retaliation, and provide avenues for prompt and immediate corrective action, with such measures to include, but not be limited to, the measures set forth above.

D.    An award for damages against Defendant in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages.

E.    An award of damages against Defendant in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for emotional distress and/or mental anguish.

F.    An award of punitive damages, liquidated damages, and any other applicable penalties in an amount to be determined at trial.

G.    Prejudgment interest on all amounts due.

H.    An award of fees and costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law.

I.    Such other and further relief as the Court may deem just and proper.

### **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: October 8, 2025
        New York, New York

Respectfully submitted,

**FILIPPATOS PLLC**

By: _____
Tanvir H. Rahman
199 Main Street, Suite 800
White Plains, New York 10601
Telephone: (914) 984-1111
Trahman@Filippatoslaw.com

*Counsel for Plaintiff*